UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 06-10355-RWZ

UNITED STATES OF AMERICA

v.

LEE GENTLE

MEMORANDUM OF DECISION AND ORDER

March 4, 2008

ZOBEL, D.J.

Defendant stands accused on one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He has moved to suppress evidence obtained after a stop and subsequent warrantless search of his motor vehicle on April 27, 2006.[1] Following a summary of the evidence are my findings of fact and conclusions therefrom.

**I.     The Testimony**

On April 27, 2006, at approximately 4:30 a.m., Officer Jared Linhares ("Linhares") of the Somerset Police Department of Somerset, Massachusetts, stopped a black Toyota Camry driven by defendant. The parties' witnesses gave conflicting versions of the events of that morning. The underlying, and decisive, issues are: (1) whether the left headlight of defendant's car was out when Linhares observed

---

[1] Defendant also moved to suppress statements he made on November 3, 2006, to agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives. The government has agreed not to use these statements in its case-in-chief, rendering that portion of defendant's motion moot.

defendant, thus providing cause to stop the car; and (2) whether the police had probable cause to search the car without a warrant.  Defendant, an African-American, asserts that he was stopped based upon racial profiling and moves to suppress the evidence obtained during the search.  He argues that both the initial stop and the subsequent search were invalid.  Witnesses for both parties testified during the evidentiary hearing.

### A. Government Witnesses

Officer Linhares has been a patrolman with the Somerset Police Department for five and one-half years.  He testified that he stopped defendant's car because the driver's side headlight was not working.  According to Linhares, he first saw defendant's car in his rearview and side mirrors when it was behind his car and decided at that time to pull it over because of the headlight.  He slowed down and allowed defendant to pass him.  Because it was early in the morning and still dark outside, Linhares was unable to see defendant's appearance nor did he know the number of occupants in the car.  He pulled defendant over shortly thereafter and called his dispatch to notify them of the traffic stop.

Linhares approached the driver's side of the vehicle and asked defendant for his license and registration.  He testified that he smelled a strong odor of freshly burnt marijuana coming from defendant's car, and when he shone his flashlight into the car he observed a clear glassine bag with a green vegetative substance sticking out of the right sleeve of defendant's sweatshirt.  Defendant handed Linhares paperwork that turned out to be the registration for a motorcycle.  According to Linhares, defendant

leaned forward with his left shoulder and reached his right arm toward the central console in the car.  Linhares three times ordered defendant to keep his hands visible, yet defendant continued to reach for the console.  Fearing defendant was reaching for a weapon, Linhares backed away from defendant's car, drew his firearm, directed defendant to get out of his car and lie on the ground, then called for back-up.

Officer Adam DaRosa ("DaRosa"), a patrolman with three years' experience, responded to Linhares' call.  He testified that when he arrived, defendant was lying on the ground at gunpoint.  DaRosa took over keeping the defendant secure while Linhares cleared defendant's car, handcuffed defendant, and placed him in the back of his patrol car.  The engine of defendant's car continued to run throughout this period.  DaRosa testified that he saw the driver's side headlight was not illuminated, and he, too, smelled a strong odor of freshly burnt marijuana.

Lieutenant Brian Leonard ("Leonard") has worked for the Somerset Police Department since 1978 and reached the rank of Lieutenant in 2002.  He arrived on the scene as Linhares was handcuffing defendant and placing him in his patrol car.  Leonard stated that he also saw the driver's side headlight of defendant's car was not working, and that he also smelled marijuana in the car.  Linhares then requested authorization for a K-9 narcotics unit due to the smell of marijuana, and Leonard gave it.  After learning a K-9 unit was not immediately available, Leonard authorized Linhares to have defendant's car towed to the Somerset Police Station.  He was concerned for the safety of the officers and K-9 unit, as defendant's car was parked in the far right lane of the highway because there was no shoulder or "break-down" lane

3

and traffic would become heavier as the morning wore on.[2]

After requesting the K-9 unit, Linhares drove defendant to the Somerset Police Station. Leonard also went to the police station while DaRosa stayed with defendant's car until a tow truck arrived and then followed the tow truck to the police station in his own vehicle. DaRosa then locked defendant's car in the station's garage, a secure three-story structure, and awaited the K-9 unit.

Massachusetts State Police Trooper Jeffrey Boutwell ("Boutwell") arrived at the police station shortly thereafter and began a search of the vehicle with his K-9 partner Brady. Boutwell, Linhares and DaRosa were all present during the K-9 search. Boutwell also noted a strong odor of marijuana in the car during the search. However, he only smelled fresh, not burnt marijuana. According to Boutwell, Brady is trained to follow the odor of narcotics back to its source and to give an "aggressive alert" by scratching the source of the narcotic odor. He walked Brady around the exterior of the car, and then allowed him to search the interior of the car. Brady did aggressively alert only to the area in front of the car's gear shift. Linhares and Boutwell then began searching the car, with Linhares in the driver's seat and Boutwell in the passenger seat. Linhares' and Boutwell's search led to their discovery of a semi-automatic handgun loaded with ammunition and a large glassine bag which contained several smaller glassine baggies of a green substance that appeared to be marijuana, all under a change tray in the area in front of the gear shift. (See Govt. Exs. 4-6.)

---

[2] Linhares stopped defendant's car on Route 6, a highway which has two lanes in each direction.

While the vehicle was at the police station garage, Linhares turned the ignition key part-way to allow the headlights to turn on but did not start the car's engine. Linhares then took several pictures of the car's headlights. (See Govt. Exs. 3 and 3B.) The pictures clearly show the driver's side headlights[3] off while the right headlights and the fog lights on both sides are on. (Id.)

### B.  Defense Witnesses

Defendant disputes that his headlight was malfunctioning on the morning of April 27, and he and his significant other, Tarajee Pass ("Pass"), so testified. In April 2006, defendant worked a morning shift at a grocery store from 5:00 a.m. to 1:30 p.m. He was on his way to work when he was stopped by Linhares on the morning of April 27, 2006. Pass, who lives with defendant, wakes up with him every morning and prepares his breakfast while he gets ready for work. She habitually watches defendant's car leave. It is typically dark when defendant leaves and from her vantage point inside the house she can see the car's headlights reflecting off a shed. Pass testified that she remembers watching defendant's car leave the driveway on April 27, 2006, and saw the headlights both directly and reflecting off the shed. According to Pass, both headlights were illuminated when defendant left.

Pass also said that defendant is conscientious about the maintenance and upkeep of his vehicle. She drives the car on occasion and has taken it to be serviced.

---

[3] This particular model, a 2002 Toyota Camry, has two white headlamps and one yellow headlamp per side, as well as one fog light on each side located below the headlamps. The pictures show that both of the white headlamps on the driver's side were unilluminated.

5

On April 21, 2006, she took the car to SpeeDee Oil Change And Tune Up ("SpeeDee") for an oil change. She personally watched the mechanic at SpeeDee go through its standard checklist, which includes a check of the car's lights and bulbs. The receipt from SpeeDee does not indicate that there was any problem with the car's headlights. (See Def. Ex. 4.)

Defendant testified that his headlights were working when he left his home that morning. He had been driving for approximately twenty to twenty-five minutes when he was stopped by Linhares. He recalled seeing Linhares' police cruiser in the right-hand lane of the highway and passing it on the left, then stopping when the cruiser turned its blue lights on. Defendant stated that when Linhares initially approached and asked for his vehicle registration, he mistakenly gave him the registration for his motorcycle. When Linhares informed him of his error, defendant reached into the central console to get his car registration. At that point, Linhares told him to put his hands on the wheel, and defendant complied. He looked over at Linhares and saw the officer slightly behind him with his gun pointed at him. Defendant obeyed Linhares' instructions to get out of his car and lie on his stomach on the ground.[4] He was arrested and ultimately booked.

Defendant remained in jail until the evening of May 5, 2006. The next morning he returned to the police station to retrieve his car which had stayed in the police station's garage. Defendant testified that after retrieving his car from the police station,

---

[4] Defendant did not answer any questions regarding the smell of marijuana in the car or the glassine bag of marijuana visible in the sleeve of his sweatshirt. Linhares' testimony on these factual points is therefore uncontroverted.

he immediately drove it to his car dealership, Colonial Motor Sales, Inc. ("Colonial"), for inspection. The inspection by Colonial did not reveal any problems with the headlights.[5]

Defendant contested the citation he received for the improperly working headlight. He was found "not responsible" after a magistrate-conducted hearing on September 11, 2006. (Def. Ex. 6.) However, Linhares, DaRosa and Leonard all testified that they did not attend the hearing and only learned of it afterward. On cross-examination defendant agreed that neither of the officers nor Lieutenant Leonard were present at the hearing, and the representative from the Somerset Police Department did not submit to the magistrate judge the photographs of the car taken by Linhares which showed the driver's side headlight unilluminated.

## II.   Findings of Fact

I find that the government has met its burden of showing defendant's left headlight was not illuminated when he was stopped by Linhares on the morning of April 27, 2006.[6] All of the police officers present agreed that the driver's side headlight was not illuminated. While such unanimity does not necessarily lead to the conclusion that they are believable, the photographs taken by Linhares that morning clearly support

---

[5] The invoice from Colonial, which is dated May 6, 2006, at 8:59 a.m. states, "Checking vehicle over. Front headlight out. Customer concern. No electrical short all lights working fine." (Def. Ex. 2.)

[6] "On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." United States v. Winston, 444 F.3d 115, 124 (1st Cir. 2006).

7

their testimony. It is difficult for the court to reconcile the photographs of defendant's car with the subsequent invoice from defendant's car dealership, which suggests that there was not an electrical problem with his headlight on May 6, 2006. Nonetheless, the invoice is not sufficient to negate the physical and testimonial evidence offered by the government that the headlight was unilluminated on the morning of April 27.[7] Although a state magistrate judge found defendant "not responsible" for the citation he received for the headlight, the state court did not have the benefit of either the officers' testimony nor the photographs of defendant's car.[8] It is also notable that both sides agree it was still dark when Linhares stopped defendant's car. I credit Linhares' testimony that he was unable to see defendant prior to pulling him over and find that he did not engage in racial profiling.[9]

---

[7] The court does not discredit the testimony of Pass and defendant that the headlights were working when defendant left his home that morning. However, defendant testified that he had been driving for twenty to twenty-five minutes prior to being stopped by Linhares. Even assuming both headlights were on when he left his home, this does not mean they were still working when he was stopped.

[8] The state magistrate judge's "not responsible" finding is not binding on this court as a matter of issue preclusion or collateral estoppel. Federal courts must look to state law to determine what effect to give to state court judgments. Allen v. McCurry, 449 U.S. 90, 96 (1980). For issue preclusion to apply Massachusetts requires, inter alia, mutuality of the parties. Commonwealth v. Williams, 725 N.E.2d 217, 220 (Mass. 2000). Here, there is no evidence that the federal government was involved in the magistrate hearing or acting in privity with state officials for purposes of the hearing. See United States v. Bonilla Romero, 836 F.2d 39, 43-44 (1st Cir. 1987) (issue preclusion inapplicable to prior state suppression hearing where defendant did not present evidence suggesting that federal prosecutors were involved in the prior hearing or otherwise in privity with state officials).

[9] I also take judicial notice of the Somerset Police Department Race Profile Statistics for Officer Linhares for the period from July 2005 though June 2006 (Govt. Ex. 13), which show that 7 of the 405 stops made by Linhares (1.5%) were of black

I also credit Linhares' and DaRosa's testimony that they smelled burnt marijuana emanating from defendant's car when it was stopped. Their perception was fully corroborated by Leonard, who consequently authorized Linhares to request a K-9 unit. Defendant makes much of the facts that Boutwell smelled only fresh marijuana when he conducted the K-9 search over an hour later and that the search did not uncover any ashes, roaches or other paraphernalia indicative of drug use. However, the seeming inconsistency between Linhares and DaRosa smelling burnt marijuana and Boutwell later smelling fresh marijuana is not significant enough to negate the fact that all of the government's witnesses testified to smelling marijuana. See United States v. Foster, 376 F.3d 577, 583-84 (6th Cir. 2004) (possible inconsistency between officers' testimony about smelling fresh versus burnt marijuana did not present a "significant conflict"). Finally, I accept Linhares' uncontroverted testimony that he observed a glassine bag of green vegetative substance that appeared to be marijuana sticking out of defendant's sweatshirt.

---

individuals, 96.0% were of white individuals, and 1.5% were of Hispanic individuals.

**III.     Conclusions of Law**

By definition, a traffic stop "embodies a detention of the vehicle and its occupants" and therefore "constitutes a seizure within the purview of the Fourth Amendment." United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001). It is well-established that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). The unilluminated left headlight on defendant's car provided probable cause for Linhares to stop the car for violating traffic laws. Once the car was stopped, the smell of marijuana coming from the car provided probable cause to search the vehicle for narcotics. United States v. Staula, 80 F.3d 596 (1st Cir. 1996) (courts agree "that when a law enforcement officer detects the odor of marijuana emanating from a confined area, such as the passenger compartment of a motor vehicle, that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area"); United States v. Taylor, 162 F.3d 12, 21 (1st Cir. 1998) ("strong odor" of marijuana provided probable cause to search car for narcotics). Because the search was based on probable cause and not incident to defendant's arrest, the fact that the police transported the car to the police garage instead of searching it at the scene does not alter this result. See Chambers v. Maroney, 399 U.S. 42, 52 (1975) (holding that when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle even after it has been impounded and is in police custody); Texas v. White, 423 U.S. 67, 68 (1975)

(reiterating Chambers); California v. Acevedo, 500 U.S. 565, 570 (1991) ("Following Chambers, if the police have probable cause to justify a warrantless seizure of an automobile on a public roadway, they may conduct either an immediate or a delayed search of the vehicle.").[10]

When probable cause exists to believe that a vehicle contains contraband or other evidence of criminal activity, the search "may encompass all areas of the vehicle in which the suspected contraband is likely to be found." Staula, 80 F.3d at 602. The area underneath the change tray in the center console was therefore a valid place for

---

[10] The government suggests that the K-9 unit's sniff of defendant's car and subsequent alert to the center console "simply heightened and focused the pre-existing probable cause" to search defendant's vehicle. (Govt.'s Mem. in Opp. to Def.'s Mot. to Suppress (Docket # 27), 12.) However, the K-9 examination, in which the dog was directed to sniff both the exterior and interior of defendant's car, itself constituted a search that must be supported by probable cause. The Supreme Court's jurisprudence in this area, which has focused on the use of drug-detection dogs to sniff the exterior of cars, suggests that using a drug-detection dog to sniff the interior of a vehicle is itself a search which implicates the Fourth Amendment. In Indianapolis v. Edmond, 531 U.S. 32 (2000), the Court concluded that the use of drug-detection dogs to sniff around the exterior of each car at a checkpoint did not "transform the seizure into a search," rationalizing that "an exterior sniff of an automobile does not require entry into the car . . . . [A] sniff by a dog that simply walks around a car is much less intrusive than a typical search." Id. at 40 (internal quotation marks and citation omitted). Similarly, in Illinois v. Caballes, 543 U.S. 405 (2005), the Court found that the Fourth Amendment does not require a reasonable, articulable suspicion to justify using a drug-detection dog to sniff the exterior of a vehicle during a traffic stop, rationalizing that the use of a dog "that does not expose noncontraband items that otherwise would remain hidden from public view" does not implicate legitimate privacy interests. Id. at 409 (quoting United States v. Place, 462 U.S. 696, 707 (1983)). See also United States v. Thomas, 787 F. Supp. 663, 684 (E.D. Tex. 1992), aff'd, 983 F.2d 1062 (5th Cir. 1993) ("[T]he placing of a dog inside the trunk and passenger compartment of a car must be considered an invasive search requiring probable cause. Just as an officer could not enter the passenger compartment or trunk of a vehicle to conduct a search without probable cause, neither can a canine be placed inside a car on less than this standard."). However, this conclusion does not affect the result in this instance, as probable cause to search defendant's car existed prior to the K-9 search.

the officers to search. Linhares testified, and Boutwell corroborated, that upon lifting the large glassine bag of suspected marijuana out of the center compartment, he immediately observed a semi-automatic pistol that had been sitting underneath the bag. In these circumstances the police were authorized to seize the firearm pursuant to the plain view doctrine without obtaining a warrant. "To satisfy the 'plain view' exception to the warrant requirement, the government must show that (1) the law enforcement agent was legally in a position to observe the seized evidence, and (2) the incriminating nature of the evidence was 'immediately apparent' to the officer." United States v. McCarthy, 77 F.3d 522, 534 (1st Cir. 1996). Here, Linhares and Boutwell observed the firearm in plain view during a lawful search of the vehicle for narcotics, satisfying the first prong. With regard to the second prong, "[t]he incriminating nature of the evidence is 'immediately apparent,' if the officer, upon observing the evidence, has probable cause to believe the item is contraband or evidence of a crime. . . . 'A practical nontechnical probability that incriminating evidence is involved is all that is required.'" Id. (quoting Texas v. Brown, 460 U.S. 730, 742 (1983). Given that the officers had already found a large glassine bag which contained individual smaller bags of suspected marijuana, the incriminating nature of the firearm was immediately apparent. See United States v. Caggiano, 899 F.2d 99, 103-04 (1st Cir. 1990), abrogated on other grounds by Horton v. California, 496 U.S. 128, 152 (1990).

Accordingly, defendant's motion to suppress (Docket # 20) is DENIED.

|    March 4, 2008    | |        /s/Rya W. Zobel        |
|---|---|---|
| DATE | | RYA W. ZOBEL |
| | | UNITED STATES DISTRICT JUDGE |